# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MICHAEL WALSH, | ) |
| Plaintiff, | ) |
| v. | ) No. 05 C 5754 |
| | ) Judge Blanche M. Manning |
| DAVID HEILMAN, and VILLAGE OF OAK LAWN, | ) |
| Defendants. | ) |

## MEMORANDUM ORDER

Plaintiff Michael Walsh was terminated by defendant David Heilman, president of the Village of Oak Lawn, as an administrative hearing officer. Walsh has filed a four-count complaint against defendants Heilman and the Village of Oak Lawn asserting a § 1983 claim under the First Amendment as well as three state law based claims. The state law based claims include the alleged violation of the Local Government Employees Political Rights Act of the State of Illinois (Count II), breach of contract (Count III), and tortious interference with contract (Count IV). Defendants Heilman and the Village of Oak Lawn move to dismiss the complaint under Fed. R. Civ. P. 12(b)(6). For the reasons stated below, the motion to dismiss is granted.

## I. BACKGROUND

Because the current motion is one under Fed. R. Civ. P 12(b)(6), the court accepts all well-pleaded allegations as true. According to Walsh, on or about December 1999, the village adopted ordinance no. 99-22-74, which implemented a system of administrative adjudication for non-vehicular code violations.[1] The ordinance created the position of hearing officer with "the

---

[1] Walsh asserts in his response that he was appointed as a hearing officer for both vehicular and non-vehicular violations and has amended his complaint to so state.

power to preside over all administrative hearings in a quasi-judicial capacity." Comp. at ¶9. The ordinance also provides that hearing officers shall be selected and appointed by Oak Lawn's village manager. Walsh alleges that in 2000, he was employed by the village as an administrative hearing officer, whose duties "consisted of hearing testimony and accepting evidence relevant to the determination of Village Code violations. Plaintiff's duties were judicial and ministerial in nature." *Id.* at 14.

According to Walsh, while a hearing officer, he campaigned for village mayoral candidate Jane Powers and worked as the campaign coordinator for incumbent trustee William Keane, a political ally of Powers. In April 2005, Powers was defeated by defendant Heilman and Keane was defeated by trustee Thomas Phelan, a political ally of Heilman. Walsh alleges that soon after the election, Heilman called Walsh and told him that he would no longer serve as an administrative hearing officer. According to the complaint, Heilman told Walsh that "he needed to get his own people in, which included the position of administrative hearing officer." *Id*. at 19.

## II. ANALYSIS

Walsh alleges that Heilman and the village violated his constitutional rights to free speech and free association in violation of § 1983 when Heilman terminated Walsh as an administrative hearing officer based solely on his support of Heilman's adversary for village mayor/manager. Heilman and the village assert that because no constitutional violation could be made as a matter of law, dismissal is appropriate. Specifically, the defendants contend that Walsh was not entitled to First Amendment protection by virtue of his policymaking position as an administrative hearing officer. Walsh contends that his was not a policymaking position for

which political affiliation is a necessary requirement.

"The First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved." *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 64-65 (1990). In this vein, the Seventh Circuit has recently noted that "in the name of freedom of speech [ ] a public official cannot be fired on the basis of his political affiliation unless the nature of his job makes political loyalty a valid qualification; this could be either because the job involves the making of policy and thus the exercise of political judgment or the provision of political advice to the elected superior, or because it is a job (such as speechwriting) that gives the holder access to his political superiors' confidential, politically sensitive thoughts." *Riley v. Blagojevich*, 425 F.3d 357, 359 (7th Cir. 2005) (citations omitted).

"The test for whether a position involves policymaking is 'whether the position authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation.'" *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 355 (7th Cir. 2005) (citation omitted). The Seventh Circuit has also articulated the test as follows:

> So the right question is whether there may be genuine debate about how best to carry out the duties of the office in question, and a corresponding need for an employee committed to the objectives of the reigning faction. *Shondel v. McDermott*, 775 F.2d 859, 864 (7th Cir. 1985); *Lindahl v. Bartolomei*, 618 F.Supp. 981, 987-88 (N.D. Ind. 1985). *When the officeholder wields the final authority of the government, the answer to that question almost always will be yes.*

*Kurowski v. Kajewski*, 848 F.2d 767, 770 (7th Cir. 1988) (emphasis added).

A. Existence of constitutional right

The Seventh Circuit recently confirmed that "the job description, if reliable, is the correct basis for the court's determining whether political affiliation is a legitimate requirement of the job." *Riley*, 425 F.3d at 364. However, the *Riley* court further noted that:

> Neither those cases [cited earlier in the opinion] nor our decision today stand for the proposition that every *Elrod/Branti* case can be resolved just by reading the job description. The description might leave the reader unclear whether the job confers any policymaking or confidential discretion, and then additional evidence would be necessary. Some job descriptions, perhaps, will have been altered by the elected officials not to reflect actual changes in the duties of a position but rather to enable them to fill jobs that do not involve such duties with their political favorites.

*Id*. at 365.

Accordingly, the court looks to the official job description as provided by Walsh in the attachment to the response to the motion to dismiss.[2] As noted above, Walsh alleges that Oak Lawn's ordinance No. 99-22-74, which was adopted on December 15, 1999, implemented a system of administrative adjudication for non-vehicular (as well as vehicular, according to the response to the motion to dismiss) code violations. The text of the relevant Oak Lawn codes is as follows:

**11-12-2: ADMINISTRATIVE COMPOSITION:** [non-vehicular]

The system of administrative adjudication of nonvehicular regulations violations

---

[2]The plaintiff did not attach the official job description (as contained in the administrative code) to his complaint, but waited until he filed his response to the motion to dismiss. "The Court notes that a district court may consider matters of public record . . . without converting a motion to dismiss under Rule 12(b)(6) into a motion for summary judgment." *Kim v. Sara Lee Bakery Group, Inc*., --- F.Supp.2d ----, 05 C 3138, 2006 WL 235086 (N.D. Ill. Feb. 1, 2006) (*citing Henson v. CSC Credit Servs*., 29 F.3d 280, 284 (7th Cir.1994) (collecting numerous circuit court cases)).

shall be composed of a Code Hearing Unit which shall be comprised of a hearing officer, and may include any one or more of the following: an administrator, computer operator/system coordinator and hearing room personnel (deputy), with the power, authority and limitations hereinafter set forth:

A. Powers Of The Hearing Officer: The hearing officer shall have all of the powers granted to hearing officers under State law, set forth at 65 Illinois Compiled Statutes 5/1-2.1-4, the provisions of which are incorporated herein by this reference, including the power to:

1. Preside over all administrative hearings as the adjudicator.

2. Administer oaths.

3. Hear testimony and accept evidence that is relevant to the existence of the Code violation.

4. Issue subpoenas to secure the attendance of witnesses and the production of relevant papers or documentation upon the request of the parties or their representatives.

5. Rule upon objections and the admissibility of evidence.

6. Preserve and authenticate the record of the hearing and all exhibits and evidence introduced at the hearing.

7. Issue a determination, based on the evidence presented at the hearing, of whether a Village Code violation exists. The determination shall be in writing and shall include a written finding of fact, decision, and order setting forth the fine, penalty, or action with which the person found liable must comply.

8. Impose penalties consistent with applicable Village Code provisions and assess costs upon finding a party liable for the charged violation. Notwithstanding those violations for which the Illinois Municipal Code limits the fine or penalty to seven hundred fifty dollars ($750.00) the hearing officer shall have the authority to impose fines and penalties up to fifty thousand dollars ($50,000.00).

9. In no event shall a hearing officer have the authority to:

a. Impose a penalty of incarceration.

b. Impose a fine in excess of fifty thousand dollars ($50,000.00).

c. The maximum mandatory fine under subsection A9b of this Section, shall be exclusive of costs of enforcement or costs imposed to secure compliance with the Municipality's ordinances and shall not be applicable to cases to enforce the collection of any tax imposed and collected by the Municipality.

**11-11-2: ADMINISTRATIVE COMPOSITION**: [vehicular]

The system of administrative adjudication of vehicular regulation violations shall be composed of a traffic compliance administrator, hearing officer, computer operator/system coordinator and hearing room personnel (deputy), with the power, authority and limitations as are hereinafter set forth:

* * *

B. Hearing Officer Duties: He/she shall be empowered and is hereby authorized and directed to:

1. Preside over the administrative hearings, established herein, as the adjudicator.

2. Administer oaths.

3. Issue subpoenas to secure the attendance of witnesses and production of relevant papers or documentation.

4. Assess fines and penalties for the violation of vehicular regulations as are established in Section 11-11-9 of this Chapter.

5. Make final determinations of:

a. Vehicular regulation violation liability.

b. Validity of notices of impending drivers license suspension.

6. Provide for the accurate recordation of the administrative adjudication hearings.

7. Issue certified notices to the Chief of Police regarding the immobilization of vehicles whose owners have received ten (10) or more final determinations of liability which remain unpaid.

In support of their argument that the administrative hearing officer position is not protected by the First Amendment, the defendants cite to *Kurowski v. Kajewski*, 848 F.2d 767,

770 (7th Cir. 1988), in which the Seventh Circuit addressed whether judges implement governmental policy. In *Kurowski*, the plaintiffs, assistant public defenders who had been fired by a recently appointed judge, asserted that their termination violated § 1983 "contending that the use of political criteria in selecting public defenders violates the first amendment, applied to states through the fourteenth." *Id*. at 769. The defendant judge asserted that because Indiana law allowed him to appoint public defenders as judges *pro tempore*, and "because the judge *pro tempore* is a policymaker for the state of Indiana, political criteria may be applied to the job of public defender." *Id.* In analyzing this argument, the Seventh Circuit stated as follows:

> A judge both makes and implements governmental policy. A judge may be suspicious of the police or sympathetic to them, stern or lenient in sentencing, and political debates rage about such questions. In most states judges are elected, implying that the office has a political component. Holders of the appointing authority may seek to ensure that judges agree with them on important jurisprudential questions. The Governor of Indiana was entitled to consider [defendant judge] Krajewski's views about the role of judges--or even simply Krajewski's political affiliation--when making the appointment, just as the voters may consider these factors without violating the first amendment when deciding whether to retain Judge Krajewski in office. (We put aside all debate about whether recourse to politics in selecting judges is good or bad; we are concerned only with the constraints the first amendment imposes on the way the State of Indiana prefers to organize its government.) What is true about the office of judge is true about the office of judge *pro tempore*. It is the same job; only the tenure of the officeholder differs. The regular judge holds office for four years; the judge *pro tempore* holds office at the pleasure of the regular judge. Since the disposition under *Elrod* and *Branti* depends on the duties of the office rather than the tenure of the incumbent, it follows that political beliefs may be the basis for the appointment of a judge *pro tempore*.

*Id.*

Thus, while ultimately holding that because the position of public defender did not require *pro tempore* judicial service under Indiana law the *public defenders* could not be fired based solely on their political affiliation, the Seventh Circuit expressly noted in its analysis that

*judges* make and implement policy and thus political beliefs and affiliations may be the basis for their appointment or termination.³

As noted by the defendants in this case, Walsh alleges in his complaint that his duties as an administrative hearing officer for the village were "judicial" in nature. Further, Walsh alleges that his employment duties as an administrative hearing officer "generally consisted of hearing testimony and accepting evidence relevant to the determination of Village Code violations." Comp. at ¶14. Moreover, Walsh alleges that the ordinance created the position of hearing officer with "the power to preside over all administrative hearings in a quasi-judicial capacity." Comp. at ¶9.

---

³The plaintiff attempts to prevent reliance on *Kurowski* on the ground that the passage cited above is *dicta*. While it is true that the text regarding the policymaking role of a judge was not central to the *Kurowski* court's ultimate holding and thus is not binding precedent, this court views the discussion as relevant and, indeed, persuasive to the issue at hand. The plaintiff's assertion that the Seventh Circuit had the opportunity to follow the *Kurowski* analysis regarding judges in *Thompson v. Illinois Dep't of Professional Regulation*, 300 F.3d 750 (7th Cir. 2002), but did not, is not well-founded. In *Thompson*, the plaintiff was the chief administrative law judge for the Illinois Department of Professional Regulation. In deciding that the position was a policymaking one not subject to First Amendment protection, the court focused on the plaintiff's administrative duties, on which spent most of his time. It is true that the *Thompson* court seems to imply that two of the plaintiff's duties, i.e., making "independent decisions" and exercising "judicial impartiality," were not policymaking. *Id*. at 757. The court noted that those "[t]wo . . . duties described in the IDCMS job description do support Thompson's assertions [that he was not a policymaker]," but concluded that they comprised less than 15% of his responsibilities and that "even in performing these duties the Chief ALJ reports to the director, preparing recommendations not independent decisions." With all due respect to the Seventh Circuit, it is unclear to this court how the last sentence supports a finding of a policymaking position. Although the way the sentence is phrased appears to suggest that preparing recommendations and not independent decisions is policymaking, this court reads that language as more properly supporting a finding that his position was *not* policymaking because Thompson was apparently not the final decisionmaker. In any event, the *Thompson* court did not cite to *Kurowski* in its opinion, and this court does not find the facts (i.e., specifically, the express judicial duties) involved to be sufficiently similar to dictate a different result from the one the court reaches herein.

The duties as laid out for a hearing officer are very similar to, if not exactly the same as, the duties that state or federal judges are expected to carry out everyday. These duties include presiding over hearings, administering oaths, issuing subpoenas, hearing testimony and accepting evidence, and ruling on objections and the admissibility of evidence. While some of these duties are more ministerial in nature, others involve making and implementing policy. *See Riley,* 425 F.3d at 363 (acknowledging that certain of the plaintiff's duties were "merely professional or ministerial" "the remaining portions of both descriptions enumerate[d] a variety of tasks that are judgmental, policy-oriented, and politically sensitive."). For example, the Oak Lawn hearing officer, like state and federal judges, not only makes a determination as to whether a code violation has occurred but also must issue an order including findings of fact and a decision as well as a statement "setting forth the fine, penalty, or action with which the person found liable must comply." The hearing officer has the authority to impose fines and penalties of up to $50,000 in a non-vehicular context and pursuant to a schedule of fines (laid out in another part of the administrative code) in the vehicular context.

Importantly, the decision of the Oak Lawn hearing officer is not simply a recommendation to another committee or board that will issue a final decision – it is the final decision of the city of Oak Lawn. *Kurowski*, 848 F.2d at 770. ("When the officeholder wields the final authority of the government, the answer to that question [whether there is genuine debate about how best to carry out the duties of the office and a corresponding need for an affiliation with the reigning political party] almost always will be yes.").

If the mayor of Oak Lawn is a "law and order" type who runs on a platform of cracking down on conduct violative of the local code (say, for instance, illegal parking), he (or she) will

want a hearing officer ready and willing to impose fines and towing orders swiftly and liberally. On the other hand, a mayor who has not made such conduct a focus of his or her campaign may be satisfied to seat hearing officers who are more lenient on parking offenders or who are less strict in finding that code violations have occurred in the first place. Given the discretion afforded to Oak Lawn hearing officers in how they carry out their duties, the village mayor has the right to appoint hearing officers whom he believes will follow through on issues relevant to his political agenda, including commitments he has made to his constituents. *Kurowski*, 848 F.2d at 770 ("If Judge Krajewski wants a judge *pro tempore* committed to "law and order" or to sympathy for criminal defendants, the first amendment is no obstacle.")

The court finds the cases relied upon by the plaintiff to be distinguishable. In *Roldan-Plumey*, 115 F.3d 58 (1st Cir. 1997), the plaintiff was a hearing examiner with the Office of the Commissioner of Municipal Affairs. After being terminated upon a change in the governorship and the head of legal division of the OCMA, Roldan-Plumey filed a §1983 action alleging a violation of his First Amendment right to freedom of association. *Id.* at 61. The court found that the position of hearing officer in that case included five specific responsibilities which left "little room for free-ranging actions independent of their limited scope." *Id*. at 62. Importantly, the court found that while the "narrowly circumscribed duties permit the officeholder the opportunity to identify and investigate irregularities, . . . [they] do not convey power or discretion to take any action as a result of these findings." *Id.*

Similarly, in *Savage v. Commonwealth of Pennsylvania*, 475 F. Supp. 524 (E.D. Pa. 1979), the court concluded on a motion for a preliminary injunction that the plaintiff's position as a hearing examiner for the Liquor Control Board was not policymaking. In so finding, the court

noted that while the examiner determines whether the evidence in a particular case indicates a violation and stated that "[i]t is entirely within the Board's discretion to accept, reject, or modify the recommendations of the hearing examiners." *Id*. at 534. Further, the Board generally did not communicate to the hearing examiner the ultimate disposition in a matter and did not seek comment from the examiner on its decision. *Id*.

The plaintiff also attempts to distinguish *Pleva v. Norquist*, 195 F.3d 905 (7th Cir. 1999). In *Pleva*, the plaintiff was a member of the Milwaukee Board of Zoning Appeals, which the court held to be a policymaking role. The court reviewed the duties of the zoning board as laid out in the Milwaukee code, which included the authority to grant or deny variances and special uses. *Id*. at 912-13. The code noted that when making variance decisions, it had to make determinations as to whether the variance was necessary for the preservation and enjoyment of property rights and whether it was contrary to the spirit and purpose of the zoning regulations or the public interest. *Id*. at 913. The court concluded that because "[b]oard members are given considerable discretion to implement the broad goals of city zoning policy," the board position was exempted from the First Amendment ban on patronage dismissals. *Id*.

While the Oak Lawn code may not describe the duties of the hearing officer in such broad terms, it does not mean that discretionary implementation of policy is not part of the hearing officer's position. Here, the Oak Lawn hearing officer is provided significant leeway to address evidentiary issues, make findings of facts and conclusions of law, issue binding determinations as to whether a violation has occurred, and, in his or her discretion, impose sanctions for violations within certain limits. The court deems these duties to include the "broad discretionary policymaking powers" exempted by the Supreme Court from First Amendment protection.

*Pleva*, 195 F.3d at 913. Thus, because neither Heilman nor Oak Lawn violated the plaintiff's First Amendment rights by terminating him, their motion to dismiss is granted.

B.     Qualified Immunity

Even, assuming, however that the plaintiff was correct that the administrative hearing officer position was not a policymaking position and thus protected by the First Amendment, Heilman is protected by qualified immunity. Pursuant to this defense, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as the conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).[4]

The test for qualified immunity has two steps. First, the court must determine whether, taking the facts in the light most favorable to the plaintiffs, the official violated a constitutional right. *See Saucier v. Katz* 533 U.S. 194, 201 (2001). Second, the court must inquire whether the right was clearly established in light of the specific context of the case. *See id.* The burden is on the plaintiff to prove that a right was clearly established at the time of the alleged constitutional violation. *Kiddy-Brown*, 408 F.3d at 356.

"To prove the presence of a clearly established constitutional right, the plaintiff must point to closely analogous cases decided prior to the defendants' challenged actions." *Id*. at 353 (*quoting Upton v. Thompson*, 930 F.2d 1209, 1212 (7th Cir. 1991)). "The law of qualified immunity does not require a plaintiff to produce a case that is 'directly on point' in order to show

---

[4]Walsh's contention that qualified immunity is not properly decided on a motion to dismiss is rejected given that the Seventh Circuit has stated that "[t]he issue of qualified immunity is to be resolved at the earliest stages of litigation." *Kiddy-Brown*, 408 F.3d at 352 (addressing qualified immunity at the motion to dismiss stage).

that a right is clearly established." *Id*. at 356 (*quoting Nabozny v. Podlesny*, 92 F.3d 446, 456 (7th Cir.1996)). Rather, "[t]he question is whether a reasonable state actor would have known that his actions, viewed in the light of the law at the time, were unlawful." *Id.* (citation omitted).[5]

Here, the court has already determined that Heilman did not violate the plaintiff's First Amendment rights in terminating him. Nor can the plaintiff demonstrate that Heilman would have known that his actions were unconstitutional using "closely analogous" cases. Indeed, the plaintiff relies primarily on cases outside this circuit (*Savage* and *Roldan-Plumey*) which, as described above, are not analogous to the facts at hand.

Accordingly, the court concludes that the "[p]laintiff has not met his burden of providing 'closely analogous' cases and, even if [the] [p]laintiff could establish a cognizable constitutional violation, his claim would be barred by qualified immunity." *Steigman v. The Democratic Party of Illinois*, 406 F. Supp. 2d 975, 990 (N.D. Ill. 2005). Thus, Walsh's claim against Heilman is barred by qualified immunity.

---

[5]This court agrees with the defendants that the plaintiff's statement of whether a right is clearly established ("it is clearly established that Walsh as a non-policy making Oak Lawn employee had a constitutional right to be free from political dismissal") is too broad and conclusory. As framed by the Supreme Court, the inquiry is as follows:

> It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see Mitchell, supra, 472 U.S., at 535, n. 12, 105 S.Ct., at 2820, n. 12; *but it is to say that in the light of pre-existing law the unlawfulness must be apparent*.

*Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987) (emphasis added).

### III. CONCLUSION

The motion to dismiss [10-1] is granted. As Walsh's federal claim is dismissed, this court declines to exercise supplemental jurisdiction over his state law claims. *See* 28 U.S.C. § 1367(c). Accordingly, Walsh's state law claims are dismissed without prejudice to bringing these claims in state court.

**ENTER:**

**DATE:** April 19, 2006

_____
**Blanche M. Manning**
**United States District Judge**